Murphy v. City of Tulsa, 18-5-0-9-7 We will hear from the Appellant's Counsel. May it please the Court, I'm John Carwile. I'm the lawyer for Michelle Murphy, the plaintiff below the Appellant here. We are here on an allegation, on a claim, on evidence of a coerced confession while in custody of a 17-year-old young woman accused of murdering her 2-month-old infant for which she served 20 years in prison and was, in fact, exonerated. The record is fact that, yes, she was exonerated, but there's never been any finding, never been any determination that the Jackson v. Deno findings and the findings of the OCCA that the confession was not coerced have been overturned. And so I keep, maybe, I'm not sure if it's still in me, that because you can be exonerated and not be guilty without your confession having been coerced. They're not mutually exclusive. Would you agree with that? I agree with that, Your Honor. Under Oklahoma law, she made a prima facie case of innocence and the Court directly dealt with the Jackson hearing, whether there was a collateral estoppel or res judicata effect to that hearing. This conviction was vacated under Oklahoma law and the District Court correctly relied on Oklahoma Supreme Court authority and Tenth Circuit authority that that vacated conviction made those findings not res judicata, not collateral estoppel, and that the one or two cases relied upon by the city were from other jurisdictions, not Oklahoma, where the juries had different roles in finding whether a confession was coerced or not, and that, in fact, one of those decisions had been questioned by a subsequent case in Michigan. So, yes, the District Court directly dealt with that issue. The city has not appealed, did not file a cross appeal, did not challenge that ruling on appeal. But, yes, that's why I say we are not bound. And the District Court squarely addressed that issue first in its summary judgment opinion. Thank you. And, of course, we're here on summary judgment, the standard being in order for the summary judgment to withstand, to stand up and be infirmed, no reasonable juror could find that the alleged policy custom existed. On this record, I was not trial counsel. We were, I took the case on appeal, and the record is difficult, challenging, in parts, maybe a mess. And we endeavored mightily, we thought in our brief, to try to really sort out the record and cite to specific appendix pages to try to understand what, in fact, was before the District Court, what, in fact, was in the summary judgment record. And we've tried to do that in our briefing brief. We set forth facts that are cited in the brief to the specific testimony about whether or not there existed, call it a policy, call it a custom, call it a standard operating procedure. Whether Tulsa, I'm sorry. Can I just get you to directly address page 31? Yes, Your Honor. Page 31 was in the summary judgment record. I can give you the page site. It was in the original response to the motion for summary judgment as Exhibit 63, Appendix 2475. But it was never cited to the court, was it? I mean, the only time it was cited was in an amended response for the proposition that Palmer had two policies with authorized constitutional violations. I respectfully disagree, Your Honor. It is cited in the body of the brief at Appendix 1354, page 31 of Palmer's testimony. It's cited as page 30-31. So were you saying that, just to make sure that we're all on the same page, that in your summary judgment brief, when you said Officer Palmer had this policy, did you cite the page in the appendix that you just referred to for that point? Page, yes. Page 30-31. For the, here's what we say in Palmer's testimony. You cited page 30-31. For that. That Palmer. But so if you're the district judge and you look to the page in the appendix, you wouldn't have found, for those pages that are cited for that point, you wouldn't have seen page 31, right? Oh, I think you would have, Your Honor. I think you would have. Exhibit 63, which contains that page, is in the original summary judgment appendix down in the district court, the exhibits. It's also in the amended summary judgment response. Recall there was a motion to strike the original response that the court granted in part, but did not strike the exhibits. But it was resubmitted as Exhibit 63 in the amended summary judgment as an exhibit. And it was cited in the brief on the appendix, page 1354, as two pages 30 and 31 of Palmer's testimony. But they were cited in different exhibits. Page 30 was in Exhibit 49, and page 31 was in Exhibit 63, correct? Page 49 did not have Exhibit 31 in it, Your Honor. You mean Exhibit 49 didn't have page 31? Exhibit 49 did not. But it was in the summary judgment record and brought to the court's attention. And I believe the district court, when the court said, I don't find it, I'm not going to alter or amend based on that basis. But even if I considered it, I would not consider it as evidence. I would find it constrained, we say erroneously, outweighed by the general policy that the Tulsa police officers would support and defend the Constitution. If our review of the record, the summary judgment record in the district court convinces us that no, it wasn't presented to the district court fairly with 30 and 31 together and argued for the proposition you're trying to use it for now. And we were to conclude that the district court did not abuse its discretion. So we can't look at Chief Palmer's testimony. What does that do to your argument here? Your Honor, I believe the standard of review is this court sits in de novo review with the record in front of it to decide if there is evidence in the record from which a reasonable fact finder could make the findings. I don't believe it's an abuse of discretion review. Well, it's an abuse of discretion about whether the district court appropriately denied the motion to amend the record with 30 and 31 together in one exhibit. I agree, Your Honor. I can't account for that motion to amend or we're stuck with that in the record. But my point is that exhibit is in the record. And by the way, it is in the exhibits of the city that they submitted in support of their motion for summary judgment. Page 31 is there. So the fact of the testimony is undisputed. And it was in both sides summary judgment exhibits. At the time, the court had the record before to rule on summary judgment. And I respectfully submit that in terms of de novo review, this court can look at it because it is appropriately there. Well, we can't look at it if it's not in the record, right? Correct. I believe it is, in fact, in the record. And there was no need to ask the court to amend to put it in the record is what, in fact, the true circumstances are. But what do we do with that? I guess, I mean, what are we reviewing, I guess, is the question. I think the court is reviewing the record the district court had before it when it denied, when it granted summary judgment and found no reasonable jury could find from the evidence, which is set out at pages 9 to 16 of our opening brief, that no reasonable jury could find that a policy existed that authorized or permitted threats to be used to coerce confessions in custodial interrogations. That's what that testimony stands for. That is the chief policymaker. This is a small police department. We've got the chief. We've got Sergeant Allen. We've got Detective Cook. And we have Allen saying that was the policy. And Palmer on pages 30 to 31 asked, do you agree that they had the full authority of the police department to make threats? And he said, I agree. I absolutely understand the issue on the record. But it's in the record. And the district judge dealt with it by saying, even if I were to consider it, I wouldn't, I don't think you can go to a jury because you've got a policy that constrains it, which I believe is invading the province of the jury. Is there that says that the fact that an officer makes threats is necessarily so coercive as to make an admission or a confession involuntary, is it? Well, Your Honor, the threat alleged here is that she would lose her child, her sole remaining child. And I do believe that the Lyman case that we cite, I don't know if we cite it in our brief, but I think a threat to take away your child, well, it's enough to get to a jury on whether there was coercion. Well, yeah, I get that. But now we're talking about a policy or custom. Yes. And I thought we were talking about pages 30 and 31 of Officer Palmer's testimony. And so with regard to a policy or custom, if the city of Tulsa had a policy that there's nothing to prevent, no per se prohibition against making threats, there's nothing necessarily insidious about that policy, is there? If it leads to coerced confessions, I believe it is insidious to make threats in interrogation. She was asked about it. But that's not in pages 30 and 31 of Officer Palmer's deposition. In other words, what you're saying is that here there was a threat. Right. The threat was used insidiously to overtake Ms. Murphy's voluntariness to overcome her freedom. But there's lots of anything, you know, just asking a lot of questions. You know, there's no per se prohibition against asking questions. But if you keep somebody in an interrogation room for 24 hours, that probably does overtake somebody's free, you know, liberty. Well, the evidence in the record, at least read in the light most favorable to Murphy, is that she was threatened in the interrogation with the loss of her child by Cook. And Allen said if Cook did that, if Cook threatened her with the loss of her child, would he be immediately disciplined? And he said no. And there is, Allen agrees that the threats were permitted in the interrogations of custodial suspects. And we believe that, again, read in the summary judgment light most favorable to the move-in tier, there was ample evidence, or there's evidence from which a finder of fact could find that there was a policy to permit threats to obtain, to coerce it to obtain confessions in a case where the confession is maybe the most damning evidence available in this context of a mother accused of this kind of crime. Doesn't the second bulletin instruct the officers on the limitations of threats and promises and the danger of coercion? I don't think so, Your Honor. I don't think so. At best, that is one interpretation of that 1987 bulletin. Because when, and I would urge the panel to read the entire bulletin. In context, that bulletin clearly only deals with threats to obtain the Miranda waiver. It's all about Miranda. It's about Miranda on every single page, and in context, that's what it talks about. The, at best, one could interpret it, but there's another interpretation, which is it only applies to Miranda, and in that sense, that would be for the finder of fact for the jury. That's our position. May I serve a couple minutes for rebuttal? Sir. I think I've only got two left. Sure. Thank you. Good morning. Are you ready? May it please the court, Michelle McGrew on behalf of the city of Tulsa. We're asking you to affirm the trial court's granting a motion for summary judgment, because it doesn't matter where you start your analysis of this 1983 case. The conclusion is that there is no genuine issue of material fact for a jury to decide. Despite given four years of litigation, a record of nearly 4,500 pages, a thousand pages of Ms. Murphy's own exhibits, she has failed to create a tribal issue of fact on any issue in this case. She was given ample opportunity to amend, correct, and supplement, and given the surreply, to respond to the city's, the training documents provided by the city. Yet she still failed to create a tribal issue of fact. Is there anything in the summary judgment record that you can point to that told officers for the city of Tulsa, don't use coercion, because that violates, in questioning witnesses, that violates the constitution? Yes. Yes. Specifically, a specific written document is a training document that specifically says that the courts will look at the totality of the circumstances to determine whether it was freely, admissions freely, and voluntarily given, because it's possible to have a written waiver and still have elements of coercion. Where are you reading from? That is city's, it's page, appellant's index 2434. It is the Miranda legal training bulletin. Are you talking about the 87 bulletin? Yes, the 87 bulletin, which on the very next page it says, or two pages later, on 2436, any coercion, physical or mental, which causes the suspect to waive his rights will invalidate the statement. Threats are strictly forbidden. Okay, is there, we'll take it. Is there anything other than the 87 bulletin? Yes, there's the training that is, these are the undisputed facts about the training. A 14 week course at the academy with a legal block on constitutional law, on Miranda, on interrogations. Do you have any evidence in the summary judgment record, again, apart from the 87 bulletin, that the content of those training seminars, or whatever they were, included the idea that you cannot coerce a witness? Yes, that's what all of the training, we also had 40 hours from cleat training with another legal block on Miranda decisions, on the 10th circuit appellate court decisions. And on top of that, when the officers became detectives, they underwent another 40 hours of training with, specifically on affidavit search warrants and interrogations and Miranda. You know, your adversary is obviously saying that, and he just did it again, that, and it's true. I mean, Miranda is a discrete set of principles that derive from a very specific Supreme Court case dealing with rights that an officer must expressly inform a witness. But there can be, certainly can be compliance with Miranda, but an involuntary confession. And so his argument is not anything about Miranda. It's on the latter, that there was an involuntary confession. Right. And what they have to prove, to prove a policy based on failure to train and supervise, is that the training and supervision was so lacking that it was obvious that the city, or the police, were deliberately indifferent and chose a different avenue. So they would have to prove that the academy training, the monthly legal bulletins, the 40 hours of cleat training every year, the legal bulletins that come out monthly, were not enough and that the city, the police chief, decided on another avenue. And that affected her ability to have a fair trial and that her rights were violated. But let's go back to the very first thing they have to prove is a constitutional violation. And they've alleged two and they can't prove either one of them. They can't create a tribal issue of fact because there's nothing in the record that proves or creates a tribal issue of fact on whether her confession was coerced. Her son disputed that she testified at the Jackson Dental Hearing under oath. She had private counsel. She was cross-examined. But you said because of page limits you're not going to, you're not going to defend the judgment to us based on the absence of a constitutional violation. Didn't you say that in a footnote? No, I said we're not conceding that there was a constitutional violation. And because of page constraint. Didn't I say this? Because of page, I'm not trying to trick you. I just maybe I'm misremembering. I thought you specifically said you're only defending the judgment based on the absence of a policy. I was going to focus on that, but he brought it up again. And they're arguing that there was a, what they've cited to in the transcript is the First Amendment complaint. That's not evidence. That's an allegation. Then they have the only other evidence is her testimony 22 years later, after she was convicted of slitting her baby's throat, that the detective threatened her. At the time that her life and liberty were at risk, she never mentioned that. She said she voluntarily gave the statement, and those are undisputed facts. And you can disregard her subsequent testimony if she had the opportunity, was cross-examined. If it's not clarifying any earlier testimony, and she was crystal clear that Detective Cook never touched her. He testified that he never threatened her, never made her any promises. The Oklahoma Court of Criminal Appeals found no evidence of coercion. And there was, there is no evidence in the record that she was, that her confession was coercive. Well, other than her current statements. Her current statements 22 years later, when the suit is not about her freedom, and a reasonable jury would have to believe that. And I don't think that is just a scintillant evidence. There's no actual evidence of coercion. But even for argument's sake, if you assume there was, they can't, there's no policy. There's five ways they can prove a policy, and they can't prove either one of them. Well, I think that Judge Bachrach was focusing on failure to train in some of his questions. And one of the things that have been difficult is there doesn't seem to be a lot of evidence about the substance of the training on interview tactics. Would you agree with that? I would agree, because once again, these officers were veteran detectives. Detective Cook went through the academy in 1975. Their depositions were taken in February of 2017. And they couldn't remember the specifics of their training. And we had tried to- Whether they could remember the specifics of their training is one thing. But we also have testimony that they didn't know that innocent people sometimes confess. They weren't aware of any, they couldn't state any constitutional limitations on an interrogation. I mean, should we be bothered by that? Well, Detective Cook said he could not remember anything about the interview. He could not remember his training. He testified he could not remember 1994. He'd been a detective for over, at the time of this investigation, for 13 years, a homicide detective. And a police veteran for 20 years. And yes, he could not remember anything. Sergeant Allen was also deposed. I'm not saying, do they remember what happened with this particular interrogation. The testimony was that these detectives who do interrogations with some regularity, and presumably were still doing interrogations, were unaware of any constitutional limitations on interrogation tactics. Well, I think what their testimony was, and both Sergeant Allen and Chief Palmer and Detective Cook had been retired at the time of their depositions for over a decade. All three of them. And I believe what they testified is they may have known back in 1994 what the constitutional limitations of interrogations were, but they could not recall at the time that they were deposed. I think that is what they testified to. But the fact of their training, it's undisputed that they were trained on constitutional limitations, on the Miranda Law, on that they would be disciplined for inappropriate touching, for threats of violence or violence, and that they could not make promises. And what they're taking, their entire case is based on the false premise that Chief Palmer said that they had the full authority of the police department to decide what threats to make. For a reasonable jury to believe that one sentence taken out of context, they would have to ignore everything that Chief Palmer testified to in a 107-page deposition, and everything he said after, and all of the training. Do you concede that Chief Palmer's testimony, including page 31, is part of the record on appeal? I think that with the exhibits that were such a jumbled mess, it was hard for him to find it in the way that the plaintiff tried to cite to the record. But to be fair to the court, we included it for a different— when he was talking about promises, it is in the record. But it's taken out of context. Because when he says the full authority of the Tulsa Police Department, what he means is the training that goes behind that badge. That the oath of office to uphold the Constitution, obey and enforce the Constitution of the United States, and that we had guidelines that they are the stewards of the Constitution. And that a jury would have to believe that he said, yes, there's a policy that they can use threats, when the very next sentence out of his mouth is that you can't make promises. And no jury is going to believe that we had a policy that you can't make promises, but it's a free rein to make threats. Especially given the training documents where it specifically says you cannot make threats, and that the court looks at the totality of the circumstances, which means they look beyond just what happened before the reading of the Miranda rights. That's what the record is. And that's not enough to overcome a motion for summary judgment, because everything else is undisputed. The training is undisputed. There is no written policy. They try to argue that the lack of a written policy becomes a policy. That is not the law. There is no direct action from Chief Palmer that had anything to do with the interview of Michelle Murphy and her confession. There is no informal customer practice. And the best evidence of that is at four years of litigation, they could not come up with one other case that the confession was suppressed by Detective Cook or any other Tulsa Police Department officer. Not one. They tried. Okay, let me ask you on the training. I just want to follow up on your change with Judge McHugh. So we do have a question, obviously, about whether we could or should look at page 31. But let me ask you, so if we do consider pages 30 and 31, question, Sergeant Allen further testified that an interrogator had the full authority of the Tulsa Police Department to decide what kind of threats to make. Do you agree with that testimony? Answer, they would have. So if we have Officer Palmer's testimony, and then we have the absence, we have undisputed evidence that the City of Tulsa provided a whole bunch of training in 1994, prior to 1994. But because of lack of recollections, there's nothing to say, no, but we don't have it in the record. I administered the CLEAP training program in 1993 or 1994, and I want to assure you that we covered the Fifth Amendment. Now, there is evidence that they covered Miranda, but we're not talking about Miranda. We're talking about the voluntariness of a confession. And so there's no evidence about the content of any of that training program, and you point out that it's understandable. Memories of Dempson, it's 1994. We have Officer Palmer's testimony that they wouldn't have had policy against, they would have had a policy against breaking promises, but the argument is they made a threat that she wouldn't be able to see her little girl. Okay, so if we have pages 30 and 31, no training that we can point to saying, officers were ever told, as Judge McHugh pointed out, about any of the constraints on voluntariness of confessions, why couldn't a reasonable fact finder say that it was obvious that eventually interrogators would take their perceived freedom to make threats that Officer Palmer acknowledged on page 31, and that there was inevitable, inevitably going to be a situation where officers overcame the free will of an interrogateee. Because the United States Supreme Court in the city of Canton versus Harris said that this is the most difficult hurdle for plaintiffs to prove in a 1983 case, is a failure to train. And they either have to prove a widespread practice of violating someone's where it's so patently obvious that her rights would be violated. And that is not the case here. Why? Because, number one, there's no evidence that it was coerced. Number two, that there was training. You'd have to ignore all the training that they did have. But you can't point to any training on this point, right? On this point where we say that- The voluntariness of a confession. The voluntariness of the confession, yes, that's part of the training. The written documents that we have submitted from 1987 through 1994, part of the training when it says no physical threats are strictly forbidden. Yeah, nobody's complaining that anybody beat up Ms. Murphy. There's- Or that they threatened to beat her up. They're saying they threatened to take away her access to her child. And no promises. And with no threats or what the testimony is from Chief Palmer and Detective Cook that's undisputed is that they made no promises. And there is training that they can't make promises, you can't make threats or mental coercion or mental intimidation. And that's from Chief Palmer's deposition. That is in the record. That is part of the policy, part of the training. When they have training on interviewing and interrogation techniques in conjunction with constitutional law, that encompasses all of that. And I can't point to a specific word other than the testimony of the former Chief of Police and Sergeant Allen who said that you would be disciplined for making threats and that includes physical force or threats of force or promises. And the same thing with- that's what Chief Palmer said. So Mike Cook couldn't remember anything. But we have the training records and we also have the affidavit of former Detective Ken Makinson who said that the training documents, the legal bulletins went out every single month and they were trained on interrogations, constitutional limitations and Miranda. And the Supreme Court has said that they didn't want the district courts to micromanage the training of various police departments because they cannot prove that any additional or better training would have caused- And again, that confession was- it's undisputed that the Oklahoma Court of Criminal Appeals found there's no evidence of coercion. They can't get past the first hurdle. But we focused on the second hurdle because there's five ways- I'll let you go over it a little bit because I take up so much of your time. But you do need to bring it to a close. Unless, like- Okay. Well, I just wanted to say that there- the law is it has to be more than a scintilla of evidence. And their entire case is focused on one sentence from a 107-page deposition and it disregards everything he said before, everything he said after, and all of the training documents and everything else that we have submitted. And again, the district court judge may have not been able to find based on the confusion that plaintiffs created, not her trial counsel, not this counsel. And- but he did say even if you regarded it and he looked at it, it's not enough because it's taken out of context. We need to summarize. Thank you. Okay. Don't go anywhere. No, I'm- Thank you. Thank you. Your Honors, to address one question about what was in the record, I went back and looked at the hearing on the motion for summary judgment, which was held and it's in the- it's in the appendix, the cover page is 4106. The Chief Palmer's testimony we've been talking about is talked about on appendix pages 4110 and 4111. So it was in front of the district court is what we submit. And one person's scintilla- first of all, it's not a scintilla, it's a statement by the final policymaker, which ratifies- Is that- can I just stop you there? Yes. Is that your single piece of evidence? No, Your Honor. It's the Chief Homicide Supervisor, Alan, making the same statement. Palmer's testimony is, do you agree with Alan's testimony that in that interrogation room, the officer had the full authority to make threats? And he says, I agree. And then Alan also testified that what Cook is alleged to have done, threatened Murphy with the loss of her child, would not subject him to immediate discipline. Didn't Chief Palmer testify that all of the officers were instructed that they couldn't interrogate in a way that violated the Constitution? He did, and here's what else he testified on page 33 of his transcript, appendix page 2656. As you sit here, do you know of anything in the Policies and Procedures Manual in 1994 that addressed the subject of do's and don'ts in interrogations? Answer, there were no policies addressing the do's and don'ts of interrogations to the best of my knowledge in 1994. And if I may, on the training issue- But is the lack of a policy enough for a 1983 action? For Palmer, to give his testimony credit that officers were trained what not to do in interrogations is contrary to his sworn testimony that there were no policies telling him what they could do or could not do. But on the training issue, here's the nut of it all. And I tried to do this in my reply brief. If you drill down and read all of the exhibits on which the city relies for evidence that officers were trained in investigations in terms of coercion, I can confidently state you will find nothing. Even the two affidavits of the two former police officers do nothing more than say, we got trained in interrogations at the academy and I looked in a box of documents and found things on interrogations and constitutional law. There is no specificity, no particular document, and no, as we tried to do in the reply brief, when you look at what was submitted by the city and admitted by the court, not stricken, but admitted as evidence of specific training on what you could or could not do in terms of threats and interrogation, there is nothing. And so that flies in the face of this argument that they were adequately trained, that there's evidence, at least on a summary judgment basis. Is there evidence in the record that they were not? They failed to come forward with any that they were. We have the expert report of our experts that they were not adequately trained. But again, on a summary judgment basis, is there evidence from which a fact finder could find both a policy or a custom or deliberate indifference, and Canton says if it's the kind of constitutional violation here, coerced confessions that would make training obvious or a need for training obvious, you don't need to show a pattern or policy. And with that, that's all I have, Your Honor. Thank you, Counsel. This matter will be submitted again. Counsel, both sides did an excellent job in your briefing and in your argument today, this matter will be submitted.